IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

RONALD E. ADAMS,

        Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

        Defendant.

CV-10-170-AC

FINDINGS AND RECOMMENDATION

ACOSTA, Magistrate Judge:

Plaintiff Ronald Adams appeals the Commissioner's decision denying his application for disability insurance benefits under Title II of the Social Security Act. The court has jurisdiction under 42 U.S.C. § 405(g). The Commissioner's decision should be affirmed.

## BACKGROUND

Adams alleged disability beginning in December 2003, due to back problems, diabetes, neuropathy, depression, and fibromyalgia. (Admin. R. 405, 412, 655.) The administrative law judge ("ALJ") applied the sequential disability determination process described in 20 C.F.R. § 404.1520.

1 - FINDINGS AND RECOMMENDATION

*See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987) (describing the regulatory decision-making process). The ALJ found Adams's ability to work affected by type II diabetes mellitus with associated neuropathy, degenerative disc disease of the lumbar spine, status post laminectomy at the L5-L6 vertibrae, and depression. (*Id.* at 25.) The ALJ found that despite his impairments, Adams retained the residual functional capacity ("RFC") to perform work at the light level of exertion that did not require direct contact with the general public. (*Id.* at 27.) The ALJ received testimony from a vocational expert ("VE") regarding the requirements of Adams's past work. The VE testified that a person having Adams's work experience and RFC could perform his former occupation of engineer technician. (*Id.* at 666). The ALJ concluded Adams was not disabled within the meaning of the Social Security Act. (*Id.* at 30).

## STANDARD OF REVIEW

The court reviews that decision to ensure that proper legal standards were applied and the findings of fact are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004). Under this standard, the Commissioner's factual findings must be upheld if supported by inferences reasonably drawn from the record even if evidence exists to support another rational interpretation. *Batson*, 359 F.3d at 1193; *Andrews v. Shalala*, 53 F.3d 1035, 1039-40 (9th Cir. 1995).

## DISCUSSION

### I. Claims of Error

Adams contends the ALJ's RFC assessment does not accurately reflect all of his limitations because the ALJ improperly discredited his subjective statements, the statements of two lay

witnesses, and the opinion of his treating physician, and because the ALJ failed to account for limitations caused by side effects of his medications.

## II.     **Credibility Determination**

Before his present application, Adams received disability insurance benefits for a closed period between September 2000 and March 2003, due to a herniated disc with nerve compression and based on all the findings necessary to meet the criteria for Listing 1.04 of the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Admin. R. 35-37.)  Adams had surgery to treat this condition in May 2001. (*Id.* at 110.)  An ALJ determined that Adams's disability ceased by March 2003, because Adams had experienced medical improvement and could perform work at the light level of exertion. (*Id.* at 36.)  In fact, Adams had begun working as a limousine driver approximately six months after surgery in 2001, and engaged in substantial gainful activity until around Thanksgiving in 2003.  (*Id.* at 653, 655.)[1]

In his present application, Adams initially alleged he became disabled in June 2003, due to back pain, diabetes, neuropathy, depression, and fibromyalgia. (*Id.* at 405, 412.)  Adams alleged he could not sit for long periods, had back pain and numbness in the lower extremities, lacked balance, walked unsteadily, and had difficulty concentrating.  (*Id.* at 412-13.)  In a disability report from March 2004, Adams alleged problems with anxiety, depression, and "adult deficit disorder." His neuropathy in the right leg had worsened, he had re-injured his back, and he had pain in the shoulders.  (*Id.* at 428.)  In another disability report dated in August 2004, Adams alleged similar physical symptoms and greater psychological distress.  (*Id.* at 438, 443).

---

[1] The question whether the ALJ's favorable decision was erroneous because Adams engaged in substantial gainful activity during the closed period of disability is not presently before the court.

3 - FINDINGS AND RECOMMENDATION

In July 2007, Adams testified that he had worked as an engineer technician using design and drafting software known as AutoCAD until he was laid off in 2000. (*Id.* at 652-53.) He then had the overlapping periods of disability and work as a limousine driver described previously. In September 2003, Adams attained the age of 62 and began receiving Social Security retirement payments. He quit his limousine driving job a month and a half later, around Thanksgiving of 2003. (*Id.* at 653-55.) Adams amended his alleged onset of disability to December 1, 2003, after the ALJ inquired about his substantial gainful activity as a limousine driver. (*Id.* at 655.) Adams said he could not return to AutoCAD work because his skills were obsolete and he could not sit long enough to do the job. (*Id.* at 656.) He could not return to limousine driving because it required sitting at the airport all day and lifting heavy luggage, and because he could not feel the accelerator and brake pedals to drive. (*Id.* at 652-53.)

Adams testified that he had no stamina to show up for work on a full-time schedule. He could walk one-third of a mile twice a day, but walked with a limp due to lack of balance and strength in the right leg and foot. He could stand for about 15 minutes. If he could lean against something, he could stand for a long time. He could sit for an hour and a half at one time, for a total of about six hours out of an eight-hour workday, as long as he could take breaks. (*Id.* at 658-59.) Adams testified that he could lift, but not carry, 50 pounds. He could lift 20 pounds "occasionally," as that term is defined in the regulations, if he did not have to carry it anywhere. He could lift and carry objects weighing eight-to-ten pounds. (*Id.* at 660.)

Adams testified that his concentration was a little scattered. (*Id.* at 663.) He was depressed and angry about a divorce in 1997. (*Id.* at 662.) He lived alone, but had close friends. He attended a men's discussion group twice a month. (*Id.* at 646-47.) He started rebuilding his house in 1980

4 - FINDINGS AND RECOMMENDATION

but it was slow going because of back surgeries. He said he still worked on it when he could find the ambition. Adams had a friend who helped him lift and hang sheet rock and he hired someone to do cement work, but he did most of the work himself. (*Id.* at 648-49.)

The ALJ accepted that Adams had functional limitations restricting him to light exertion, and limiting the time he can stand, walk, or sit to about six hours in an eight-hour day. The ALJ also believed that Adams should not be required to interact with the general public. The ALJ did not accept that Adams's impairments precluded work consistent with his RFC assessment. (*Id.* at 28.) In effect, the ALJ discounted Adams's allegations that he cannot lift and carry 20 pounds occasionally, stand or sit for a total of six hours in an eight-hour workday, and that he lacked the stamina to sustain a full-time work schedule.

If a claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged and no affirmative evidence of malingering exists, the ALJ must assess the credibility of the claimant regarding the severity of symptoms. *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008); *Smolen v. Chater*, 80 F.3d 1273, 1281-82 (9th Cir. 1996); *Cotton v. Bowen*, 799 F.2d 1403, 1407-08 (9th Cir. 1986); Social Security Ruling ("SSR") 96-7p, 1996 WL 374186.

Here the ALJ found Adams's medically determinable impairments could reasonably be expected to cause his alleged symptoms. (Admin. R. 28.) Under these circumstances, an ALJ may discredit the claimant's testimony regarding the severity of symptoms by providing specific reasons for the credibility finding, supported by substantial evidence in the case record. SSR 96-7p, 1996 WL 374186, at *4. The ALJ must make findings that are sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony.

5 - FINDINGS AND RECOMMENDATION

*Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008); *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995). In addition, the ALJ must explain the credibility finding with clear and convincing reasons. *Carmickle*, 533 F.3d at 1160; *Smolen*, 80 F.3d at 1283.

In making a credibility determination, the ALJ should consider objective medical evidence, the claimant's treatment history, daily activities, and work record, and the observations of treating sources and third parties with personal knowledge of the claimant's functional limitations. 20 C.F.R. § 404.1529(c); *Tommasetti*, 533 F.3d at 1039; *Smolen*, 80 F.3d at 1284; SSR 96-7p, 1996 WL 374186.

The ALJ considered appropriate factors in his credibility determination. He reviewed Adams's treatment history and found he had received only routine care and conservative treatment during the period for which he claimed disability. (Admin. R. 29.) A conservative course of treatment can undermine allegations of debilitating symptoms. *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995); *Carmickle*, 533 F.3d at 1162.

The ALJ's conclusion is supported by substantial evidence. As a baseline, during 2003, Adams's primary care provider, Frances Biagioli, M.D., saw him for routine followup of his diabetes and depression. Adams reported he was swimming almost every day, seeing a counselor twice a month, compliant with diabetes, hypertension, and antidepressant medications. Adams's physical examination was generally benign; he had some loss of sensation in the right foot, but his gait was normal. He appeared somewhat depressed. (*Id.* at 526-27.) This was the medical evidence of his condition at the initial alleged onset of disability in June 2003.

In December 2003, at the amended alleged onset of disability, Adams's mental health treatment provider indicated he had been seen in counseling from November 2001 until June 2003.

This treatment resulted in a diagnosis of major depression, single episode. Adams seemed to be limited socially, but his counselor found nothing remarkable about his activities of daily living. He assessed Adams's global functioning at 65, an assessment which indicated only mild symptoms. (*Id.* at 450-52, 463.) *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. Text Revision 2000) (GAF 61-70 indicates mild symptoms in a person who is generally functioning pretty well and has some meaningful relationships).

Adams next saw Dr. Biagioli in August 2004 for a routine follow up after nearly a year and a half. Adams's diabetes and hypertension were under good control. He had discontinued Zoloft on his own and was no longer in counseling, but he felt better, had a new girlfriend, and did not think he needed mental health treatment. His chronic right leg pain was unresolved. Adams reported low energy but he was able to mow the lawn and do his usual activities. He had seen a naturopath who told him his red blood cells were clumping, he probably had mercury poisoning, and he would probably develop fibromyalgia. (Admin. R. 524-25).

In September 2004, after the initial denial of his disability claim, Adams reported arthritis in the knees and shoulder, dizziness, lethargy, swollen ankles, and increased depression. He said he could not afford counseling and had no interest in antidepressant medications. He reportedly was having difficulty finding work. He had been going to the gym several times a week, but had not done so for about a week. Dr. Biagioli observed that Adams was depressed, but no more than usual for him. Laboratory examinations were generally normal except he had a small amount of protein in his urine. Dr. Biagioli ordered an echocardiogram, which was also normal. (*Id.* at 522-23.)

In February 2005, Adams had a neuromuscular consultation to evaluate his complaints of chronic pain, weakness, and generalized fatigue. Jeffrey Wagner, M.D., observed that Adams was

obese and seemed depressed. On physical examination Adams demonstrated full strength in the upper extremities, but had frequent giveway and intermittent effort. In the lower extremities, the giveway and intermittent effort were even greater, making assessment difficult, but Dr. Wagner believed Adams had at least 4+/5 strength when he gave his best effort. Adams's ankle jerk reflexes were absent. All other reflexes were within normal limits. Adams had sensory loss in the lower extremities. His gait was abnormal in a "very embellished" way. (*Id.* at 518.) Dr. Wagner reviewed electromyographic nerve conduction studies from June 2000 which were consistent with peripheral diabetic neuropathy. Dr. Wagner recommended a peripheral neuropathy work up, but Adams said he could not pay for the tests. Dr. Wagner identified good options for treating his peripheral neuropathy pain, including a tricyclic antidepressant medication, gabapentin, and carbamazepine, all of which were shown to be beneficial in patients with the kind of pain Adams's described. Dr. Wagner suggested that Adams divert funds he had been spending on alternative therapies to pay for trials of these treatments. (*Id.* at 518-19.) There is no indication in the record that Adams tried these recommended therapies.

In February 2006, Paul Bart Duell, M.D., an endocrinologist, evaluated Adams for his multiple medical problems. Dr. Duell noted that noncompliance with recommended medical therapies appeared to be part of Adams's problem. He noted, for example, that Adams's blood pressure was severely elevated after Adams had discontinued his blood pressure medication. Blood tests from 2005 had shown low testosterone and Adams had symptoms of hypogonadism, but Adams reportedly could not afford followup testing and had discontinued testosterone therapy on his own. (*Id.* at 514-16.)

In April 2007, Dr. Duell saw Adams again for a routine followup of diabetes, hypertension, obesity, and depression, with complaints of diffuse arthritic pain, cold feet, and hair loss on the lower legs suggestive of vascular insufficiency. A peripheral arterial examination of the legs with Doppler ultrasound was normal, however. Dr. Duell presumed Adams's fatigue was attributable in part to depression and sleep disruption caused by chronic pain, because he did not appear to have sleep apnea. He referred Adams for a rheumatology evaluation for his complaints of chronic arthritic pain. (*Id.* at 511-12.)

Atul Deodhar, M.D., performed the rheumatology evaluation and found no signs of inflammatory arthritis. Adams had some osteoarthritic degenerative changes at base of both thumbs but his other joints were entirely normal. Dr. Deodhar diagnosed osteoarthritis at the bases of the thumbs, but did not reach a diagnosis to explain Adams's generalized diffuse arthritis-like pain. (*Id.* at 504, 509-10.)

Dr. Duell saw Adams again in June 2007, to initiate testosterone replacement therapy. Dr. Duell's objective findings were generally benign, except that Adams had elevated blood pressure and reduced sensation in the feet. Dr. Duell observed that Adams's looked fatigued but his mood was within normal limits. (*Id.* at 506.) This was the extent of the treatment history when the ALJ issued his decision. The ALJ correctly observed that it reflects a routine, conservative course of treatment without the extraordinary findings or level of treatment generally associated with debilitating symptoms. *Johnson*, 60 F.3d at 1434; *Carmickle*, 533 F.3d at 1162.

The treatment history shows no event or change in the care sought or prescribed that would suggest disabling impairments began in December 2003. The record does not suggest any significant change in Adams's condition after the previous determination that Adams had experienced medical

improvement and could perform work at the light level of exertion. (*Id.* at 36.) Indeed, the alleged onset of disability occurred midway through an 18-month hiatus during which Adams did not seek any treatment for his allegedly disabling physical conditions. Likewise, he ended his mental health counseling six months before the alleged onset of disability, with only mild symptoms and reportedly good function. When a claimant does not seek treatment for months after the alleged onset of disabling symptoms, the ALJ may draw an adverse inference as to the credibility of the allegation. *Bruton v. Massanari,* 268 F.3d 824, 828 (9th Cir. 2001).

      The ALJ found the treatment history showed that Adams had not complied with prescribed and recommended medical treatment. (Admin. R. 29.) For example, in August 2004, Adams reported he had discontinued prescribed antidepressant medication and did not think he needed it. (*Id.* at 524.) A month later he complained he was very depressed, but was not interested in restarting antidepressant medications. (*Id.* at 522-23.) In February 2005, Dr. Wagner recommended three medication options known to alleviate peripheral neuropathy pain. He was aware that Adams had financial difficulties, but suggested he could divert funds used for naturopathic treatments. (*Id.* at 518-19.) In February 2006, Adams reported he had discontinued prescribed testosterone replacement treatment and hypertension medication. Adams indicated he could not afford the testosterone prescription, but gave no explanation for discontinuing the blood pressure medication he had been taking for several years with good results. (*Id.* at 514-16.) Some of the recommended diagnostic tests and treatments, such as a pituitary MRI examination and testosterone replacement therapy, are prohibitively expensive and it is reasonable that Adams would avoid them based on his alleged financial condition. (*Id.* at 514-15.) However, his most limiting conditions, peripheral neuropathy pain and depression, are treatable by widely available generic drugs, including those recommended

by Dr. Wagner. (*Id.* at 518-19.) The ALJ could reasonably infer from Adams's apparent lack of interest in these affordable treatments that his symptoms might be less limiting than he claimed. *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007); *Tonapetyan v. Halter,* 242 F.3d 1144, 1147-48 (9th Cir. 2001); *Flaten v. Sec'y of Health & Human Serv.*, 44 F.3d 1453, 1464 (9th Cir. 1995); *Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir. 1993).

      The ALJ found Adams's reported daily activities inconsistent with the debilitating symptoms he claimed. (Admin. R. 28-29.) Adams lives alone and independently manages all of his personal care, hygiene, and grooming, and all of the household chores such as cooking, cleaning, laundry, and yard maintenance. He reported going to the gym several times a week and mowing the lawn. (*Id.* at 522, 524.) He drives a car to shop for groceries, run errands, and visit friends, activities contrary to his testimony claiming to be unable to operate the gas and brake pedals of a limousine. (*Id.* at 422, 426, 652-53.) He remodeled and built an extension on his house, doing most of the work himself. This has been a slow, ongoing process over a 20-year period, but Adams testified that he still works on it when he can find the ambition to do so. Although he had a friend to help with heavy lifting and carrying, Adams testified that he participated in putting up and mudding sheet rock, installing wiring, and engaging in other construction tasks that are inconsistent with his alleged limitations. (*Id.* at 648-49.)

      These activities are not equivalent to sustained full time employment, but they do suggest that Adams is more capable than he alleged in his disability reports and testimony. The ALJ could reasonably infer from the treatment history, the reported activities, and the record as a whole, that Adams was not entirely credible in asserting he could not lift and carry 20 pounds occasionally, stand or sit for a total of six hours in a day, and sustain full time work limited to activities within his RFC.

11 - FINDINGS AND RECOMMENDATION

Even if the record could reasonably be interpreted in another manner more favorable to Adams, the court is not free to overturn the Commissioner's rational findings of fact. *Batson*, 359 F.3d at 1193; *Andrews*, 53 F.3d at 1039-40.

### III.   Medical Source Statement

Adams contends the ALJ improperly rejected the medical source statement of Dr. Duell, his endocrinologist. Dr. Duell examined Adams in February 2006 for multiple medical problems, but primarily for low testosterone and symptoms of hypogonadism. Dr. Duell believed that noncompliance with medication prescriptions was contributing to Adams's problems because Adams had discontinued his hypertension medication and his testosterone replacement gel on his own, contrary to medical advice. (*Id.* at 514.) Dr. Duell gave Adams new prescriptions and told him to return to see him in three to four months. (*Id.* at 515.)

Adams did not return to see Dr. Duell for more than a year. In April 2007, Adams had discontinued one of his prescribed diabetes medications on his own, but his glycemic control appeared to be adequate. He continued to have diffuse pain which warranted a rheumatology referral. He continued to have symptoms suggestive of hypogonadism warranting another trial of testosterone replacement therapy. (*Id.* at 511-12.) When Adams returned in June 2007, he had not filled his testosterone replacement prescription. Dr. Duell obtained generally benign findings in his physical examination, except Adams was obese and had elevated blood pressure, loss of sensation in the feet, and loss of hair on the lower legs. Dr. Deull again attempted to start Adams on testosterone replacement therapy. (*Id.* at 506-07.) This was the extent of Dr. Duell's treatment history with Adams when Dr. Duell issued the opinion that Adams contends the ALJ improperly rejected.

12 - FINDINGS AND RECOMMENDATION

In July 2007, Dr. Duell completed a questionnaire worksheet indicating that Adams's condition could cause severe fatigue, poor stamina, and lethargy. (*Id.* at 624.) Dr. Duell indicated Adams could lift less than 10 pounds, whether occasionally or frequently, stand or walk about two hours out of an 8-hour day, and sit less than six hours in an 8-hour day. He indicated Adams would need to lie down during the day if his back pain or fatigue became severe. Dr. Duell said Adams would miss more than 2 days per month from a full time job, even if limited to sedentary activities. (*Id.* at 625.) Dr. Duell said the side effects of Adams's medications could include fatigue, confusion, and marked impairment of concentration, persistence, or pace. (*Id.*)

The ALJ gave limited weight to Dr. Duell's opinion. An ALJ can reject a treating physician's opinion in favor of the conflicting opinion of another treating or examining physician, if the ALJ makes "findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Thomas v. Barnhart*, 278 F.3d 947, 956-57 (9th Cir. 2002), quoting *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). If the treating physician's opinion is not contradicted by another physician, then the ALJ must provide a clear and convincing explanation. *Id.* The ALJ's explanation is sufficiently specific, clear, and convincing under either standard.

A treating physician's opinion is ordinarily afforded great weight in disability cases because a treating physician is employed to cure and has a good opportunity to know and observe the claimant as an individual. *Ramirez v. Shalala*, 8 F.3d 1449, 1453 (9th Cir. 1993). This rationale does not fit perfectly when applied to Dr. Duell's opinion, however. The ALJ correctly pointed out that Dr. Duell's opinion was not a report generated in the course of treatment, but a worksheet questionnaire generated by Adams's representative in support of his disability claim. (Admin. R.

13 - FINDINGS AND RECOMMENDATION

29, 624-27.) In producing the questionnaire, Dr. Duell's role was not solely to cure. In addition, Dr. Duell's opportunity to know and observe Adams was limited to three office visits spread over a 16-month period and his treatment focused primarily on an endocrine system abnormality, hypogonadism, which was not among the disabling impairments Adams claimed.

The ALJ found that Dr. Duell's opinion was not supported by his own objective findings. This is supported by substantial evidence. In February 2006, Dr. Duell had generally benign objective findings except that Adams was obese and had severely elevated blood pressure. Adams's laboratory tests showed low total testosterone concentration, fair but deteriorating glycemic control, and good cholesterol levels. Imaging showed mild heart defects. (Admin. R. 514-15.) In April 2007, Dr. Duell obtained generally benign findings except that Adams had cold feet and hair loss on the lower legs suggestive of vascular insufficiency. A peripheral arterial ultrasound examination was normal, however. (*Id.* at 512, 595.) In June 2007, Dr. Duell's findings were generally benign except that Adams had elevated blood pressure, diminished sensation in the feet, and looked fatigued. (*Id.* at 506.)

None of these findings support extreme limitations such as the inability to lift 10 pounds occasionally, the inability to stand or walk a total of two hours in a full work day even with frequent breaks, the necessity to lie down to rest during the day, or the need to be absent from a normal work schedule. An ALJ can reject a physician's opinion that is conclusory and unsupported by clinical findings. *Meanal v. Apfel*, 172 F.3d 1111, 1117 (9th Cir. 1999).

In the absence of objective findings or clinical observations to support the limitations Dr. Duell proposed in his questionnaire, the ALJ reasonably inferred that Dr. Duell relied primarily on Adams's subjective claims of limitations. An ALJ can properly reject a physician's opinion that is

premised on the claimant's own subjective complaint of disabling symptoms which the ALJ properly discounted. *Fair*, 885 F.2d at 605; *Tonapetyan*, 242 F.3d at 1149.

The ALJ found the extreme limitations in Dr. Duell's questionnaire responses were not consistent with the activities Adams reported or his conservative treatment history of routine care. The ALJ found the agency reviewing doctors' findings were more consistent with the record as a whole than the findings of Dr. Duell. (Admin. R. 29, 490-502.). Although they did not examine Adams, they had the benefit of the entire record, including information pertinent to Adams's credibility which was not available to Dr. Duell. Under the circumstances, the court cannot conclude that the ALJ's reliance on the agency reviewing physicians was unreasonable.

IV.   **Lay Witness Statements**

Adams contends the ALJ improperly rejected the written statements of two lay witnesses. An ALJ must consider the statements of non-medical sources who are in a position to observe a claimant's symptoms and daily activities. *Bruce v. Astrue,* 557 F.3d 1113, 1116 (9th Cir. 2009); *Stout v. Comm'r, Soc. Sec. Admin.,* 454 F.3d 1050, 1053 (9th Cir. 2006). Such lay witnesses are competent to testify regarding the claimant's condition. *Dodrill v. Shalala,* 12 F.3d 915, 918 (9th Cir. 1993). Lay testimony as to the claimant's symptoms or how an impairment affects the ability to work cannot be disregarded without comment. *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996). If the ALJ wishes to discount lay witness testimony, he must give reasons that are germane to the witness. *Id.*; *Bayliss v. Barnhart*, 427 F.2d 1211, 1218 (9th Cir. 2005); *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001).

In December 2003, Richard Slaybaugh prepared a third-party function report based on his long-term friendship with Adams. He indicated that Adams had difficulty walking very far due to

15 - FINDINGS AND RECOMMENDATION

discomfort in his legs and feet. (Admin. R. 419.) He said Adams did typical household chores, but took longer to complete them than normal. Adams did not do much yard work because he had difficulty working on his knees. Slaybaugh said Adams drove his car when he went out for shopping or to visit. Adams had no difficulty getting along with others. Slaybaugh observed no difficulty with attention, completing tasks, following instructions, interacting with authority figures, dealing with stress, or handling changes in routine. (*Id.* at 421-25.) Slaybaugh said Adams could not walk well enough to hike or take hunting trips, and was limited to going places where he could drive. (*Id.* at 426.)

In July 2007, Slaybaugh produced another witness statement. He did not think Adams could walk 100 yards, especially on uneven ground. He said Adams had difficulty sitting in some situations, such as at a computer desk all day, but he had no problem sitting in his Ford Ranchero. Slaybaugh said Adams could not lift much more than a carton of milk. Adams has difficulty with stairs, although he lived in a home with stairs. Slaybaugh said Adams could no longer participate in hunting or fishing. He did not think anyone would hire Adams. (*Id.* at 447.)

In July 2007, Andrew Gorman provided a written statement indicating he helped Adams hang sheet rock at his home and cut firewood for winter. Gorman said Adams had no feeling in his feet and could not walk far or stand for very long. He said Adams had no sense of balance, limited strength, and could not walk normally. Gorman said Adams could sit for a couple of hours and then would have to get up and move around. He said Adams could lift a gallon of milk. He thought Adams was depressed. (*Id.* at 445.)

The ALJ did not disregard or discredit the statements of Slaybaugh and Gorman, although he viewed them with caution. The limitations described in the lay witness statements are vague and

not in obvious conflict with the limitations in Adams's RFC assessment. The ALJ accepted that Adams had discomfort in his legs and could not walk very far. The RFC does not require him to be able to sit all day at a computer desk. Adams's past work as an engineer technician is a sedentary occupation requiring very little lifting or carrying, consistent with the lay witnesses' description of Adams's lifting limitations. (*Id.* at 664.)

If the ALJ intended to discredit the lay witness statements, his reasoning was insufficient. The ALJ viewed the lay witnesses' statements with caution because each had a personal relationship with Adams and lacked the expertise and motivation to offer an objective or functional assessment of his limitations. (*Id.* at 29.) Lay witnesses in disability cases typically are family members, friends, and coworkers. *Dodrill v. Shalala,* 12 F.3d 915, 918 (9th Cir. 1993). Therefore, the personal relationships Slaybaugh and Gorman had with Adams are characteristic of virtually all lay witnesses and do not provide a germane reason to discount their statements. Their personal relationships placed them in position to observe Adams's symptoms, interactions with others, and daily activities. These observations, not the witness's expertise, are the foundation for lay witness statements. Lay witness statements by definition do not require expertise. In addition, there is no evidence in the record from which the ALJ could reasonably make any inference about the motivation of these lay witnesses in providing their statements. Accordingly, to the extent the ALJ discredited the lay witness statements, he erred by providing insufficient explanation.

As noted previously, however, the limitations described in the lay witness statements are vague and do not conflict in any obvious way with the limitations in Adams's RFC assessment. Even if the lay witness statements were fully credited, therefore, the ALJ's RFC assessment would

17 - FINDINGS AND RECOMMENDATION

remain supported by the record. Under these circumstances, any error in the ALJ's evaluation of the lay witness statements was harmless. *Carmickle*, 533 F.3d 1162-63 and n. 4.

## V.   Medication Side Effects

Adams contends the ALJ failed to consider the side effects of his medications in assessing his limitations. Adams did not allege limitations from medication side effects in his disability reports. (Admin. R. 412-15, 428, 431, 438, 443.) He discussed his medications without mentioning side effects in his hearing testimony. (*Id.* at 661.) He testified that he had poor stamina and fatigue, but did not suggest that these symptoms were related to medications he was taking. (*Id.* at 657, 658.) He did not complain of medication side effects to treating sources. Adams relies on treatment notes from August 2004, which reflect he complained to Dr. Biagioli of increasing fatigue. These complaints were not associated with medication side effects, however. If anything, Adams suggested they were associated with mercury poisoning. (*Id.* at 525.) The lay witnesses did not mention side effects of medications in their statements. (*Id.* at 419, 445, 447.)

The only mention of medication side effects was in Dr. Duell's questionnaire worksheet from July 2007. Dr. Duell said the side effects of Adams's medications could include fatigue, confusion, and marked impairment of concentration, persistence, or pace. (*Id.* at 625.) Nothing in the record suggests that these potential side effects actually occurred in Adams's case. In Dr. Duell's own treatment notes, he attributed Adams's complaints of fatigue to depression, sleep disruption, or hypogonadism, but did not mention medication side effects. (*Id.* at 512.) In any event, the ALJ provided a proper basis to discount Dr. Duell's questionnaire worksheet and further evaluation of his statement regarding potential side effects of medications was not required.

\\\

## RECOMMENDATION

For the reasons set forth above, the Commissioner's decision should be AFFIRMED.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

IT IS SO ORDERED.

DATED this 8th day of December, 2011.

/s/ John V. Acosta
John V. Acosta
United States Magistrate Judge